UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
GENERAL JURISDICTION

JAMES H. RIDINGER AND LOREN RIDINGER

Plaintiffs

vs.

CLAUDIO ROSSI, CLAUDIA ROSSI
 & FEDERICO ROSSI

DEFENDANTS

_____/

## COMPLAINT

## JURISDICTIONAL ALLEGATIONS

1. This is an action by Plaintiffs James H. Ridinger and Loren Ridinger against Defendants, Claudio Rossi, Claudia Rossi and Federico Rossi, individually for Intentional Misrepresentation, Negligent Misrepresentation & Civil Conspiracy.

2. This action is within the jurisdiction of this Court pursuant to 28 U.S.C.§ 1332 as it involves citizens of a State and a citizen of a foreign state and seeks damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

3. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1332 (b) (2) as a substantial part of the events or omissions giving rise to the claim occurred in this district.

4. Plaintiffs James H. Ridinger and Loren Ridinger are citizens of the State of Florida and reside within the boundary of the Southern District of Florida.

5.  Defendants are, upon information and belief, citizens and residents of Italy who have committed tortious acts within the state of Florida or who have caused injury in the state of Florida as more particularly described herein.

6.  Defendant Claudio Rossi maintains a Miami business address of Four Seasons Office Tower, 1441 Brickell Avenue, Suite 1400, Miami, FL.

7.  Defendants are subject to the personal jurisdiction of this Court as the Florida long-arm statute, Fla. Stat. § 48.193(1)(a)(2), provides a basis for personal jurisdiction over the nonresident defendants, to wit, the commission of a tortious act within the state, and sufficient minimum contacts exist between Florida and the defendants to satisfy due process requirements.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

8.  Defendants Claudio Rossi, Claudia Rossi and Federico Rossi (hereinafter "Family") own and operate a shipyard (hereinafter "Family Shipyard") in in Viareggio, Italy.

9.  Claudio Rossi is the CEO of the Family Shipyard and had a personal, pecuniary and financial interest in the construction and sale of high-speed luxury yachts manufactured by the Family Shipyard.

10. Federico Rossi is the COO of the Family Shipyard and had a personal, pecuniary and financial interest in the construction and sale of high-speed luxury yachts manufactured by the Family Shipyard.

11. Claudia Rossi is the Sales Director of the Family Shipyard and had a personal, pecuniary and financial interest in the construction and sale of high-speed luxury yachts manufactured by the Family Shipyard.

12. Claudio Rossi had a personal, pecuniary and financial interest in inducing persons such as the Plaintiffs to invest in or fund the construction or purchase of high-speed luxury yachts manufactured by the Family Shipyard.

13. Federico Rossi had a personal, pecuniary and financial interest in inducing persons such as the Plaintiffs to invest in or fund the construction and sale of high-speed luxury yachts manufactured by the Family Shipyard.

14. Claudia Rossi had a personal, pecuniary and financial interest in inducing persons such as the Plaintiffs to invest in or fund the construction and sale of high-speed luxury yachts manufactured by the Family Shipyard.

15. The family business' continuing economic existence is dependent upon receiving orders to build custom yachts.

16. The financial well-being of the Family is dependent upon the continuing existence of the Shipyard.

17. In November of 2014 the Family received an order for a 63 meter (207 foot) yacht (hereinafter "Yacht").  This project was initially known as the Vector Project.  The Vector Project was to design and build a high-speed, stable, shoal (shallow) draft yacht capable of crossing the Atlantic Ocean.

18. When the Yacht was substantially constructed in the Family Shipyard, the order was cancelled.

19. The Family was faced with financial hardship unless another buyer could be found to purchase and finish the Yacht.

20. The Family began marketing the uncompleted Yacht as a revolutionary design –a fast yacht that had a shallow draft and was stable with transatlantic capability in all sea states with excellent sea-keeping properties.

21. The Yacht was represented by the Family as being designed to provide very smooth comfortable cruising.

22. Rather than employing traditional fins stabilizers, this "revolutionary" Yacht was designed to be stabilized by an internal gyrostabilizer system.

23. The Family members marketed the design and gyrostabilizer system as proven technology when in fact, it was never previously deployed on a yacht of similar size or specifications with a shallow draft design.

24. The Family members marketed the uncompleted hull worldwide in an effort to prevent financial ruin.

25. The Plaintiffs learned of the "revolutionary" Yacht in mid-March 2016 from a South Florida yacht broker retained by the Family and using information provided by the Family to market the partially constructed yacht situated in the Family Shipyard.

26. The marketing material provided by the Family to the yacht broker touted among other features and specifications that "Properly sized gyroscopic stabilizers" were "fitted, to reduce the roll motion with the vessel at cruising speed and at anchor. The stabilization will allow a roll reduction of about 70%-90%."

27. At the time the Family marketed the Yacht to Plaintiffs the hull and deck were completed with most major machinery in place including the gyro stabilizer.

28. After Plaintiffs expressed an interest in the "revolutionary" Yacht, Claudia Rossi began communicating with Plaintiffs in Miami by telephone and email providing information

intended to develop the Plaintiffs' interest in funding or investing in the construction of the ocean-going high-speed luxury Yacht capable of unrestricted navigation.

29. Telephonic discussions ensued in which the Family made representations about the Yacht's wide beam, shallow draft and high-speed attributes, including the stability and reliability of the stabilization system.

30. During a March 22, 2016 telephone call, Claudia Rossi was informed that if Plaintiffs funded the completion of the construction of the Yacht, their intended use of the Yacht would include cruising the Bahamas and Caribbean with grandchildren.  Claudia Rossi affirmed the Yacht would be perfect for a family cruising with children.

31. On March 30, Claudia Rossi informed the Plaintiffs the Yacht was "revolutionary" in regard to its speed, shoal draft and stability.

32. On March 31, 2016 there was a technical conference call between the Plaintiff and the Family.  During the conference call:

    a.  The Family members represented the Yacht was designed and constructed to navigate in Florida waters, the Bahamas and the Caribbean.

    b.  The Family members represented the Yacht was capable of unrestricted navigation which means the Yacht can sail in any seas in any seas condition.

    c.  The Family members represented the Yacht was especially stable for shallow water navigation in the Bahamas.

33. At all times material while making the representations, the Family members were aware and publicized the fact that a vessel which was "not based on a functional platform is worth nothing."

34. On May 2, 3 & 4, 2016, the Plaintiffs sent representatives to the Family Shipyard to meet with the Family members to inspect the Family Shipyard and status of construction of the Yacht and to obtain additional information regarding the specifications and performance details of the Yacht.  During this inspection, representatives of the Plaintiffs questioned the Family about whether the gyro stabilizer would be adequate to stabilize the Yacht. The Family assured the representatives that the gyro installed on the Yacht was proven technology; would properly stabilize the Yacht and function better than traditional fin stabilizers.

35. The representatives were informed that the gyro stabilization system installed on the Yacht would keep the Yacht stable in lieu of traditional stabilizer fins.

36. During the May conference at the Family Shipyard, Claudio Rossi stated "I have a big interest to sell to American clients and particularly in Miami" disclosing the Family's financial motive of breaking into the lucrative South Florida yacht market through the marketing and sale of the Yacht to the Plaintiffs.

37. Claudio Rossi and Federico Rossi came to Miami on May 19 & 20, 2016 in furtherance of their intent to mislead the Plaintiffs into investing money in the Yacht by pitching the Yacht and her capabilities to Plaintiffs including the proven technology of the gyro stabilization system.

38. On May 19th and 20th 2016, Plaintiffs entered into discussions in Miami in which Claudio Rossi and Federico Rossi intended to develop the Plaintiffs' interest in funding or investing in the construction of the ocean-going high-speed luxury Yacht capable of unrestricted navigation.

39. Claudio Rossi and Federico Rossi were aware of Plaintiffs' expressed concerns as to the engineering of the Yacht built at the Family Shipyard and whether the investment of funds to construct the Yacht or fund its purchase would be a prudent investment which would result in the construction of an ocean-going high-speed luxury yacht capable of unrestricted navigation.

40. In order to induce the Plaintiffs to proceed with funding of the construction and purchase of the Yacht manufactured by the Family Shipyard, Claudio Rossi and Federico Rossi individually, and for their own personal, pecuniary and financial gain, entered into discussions with the Plaintiffs and their representatives during which time the Defendants made statements as to the Yacht, its engineering, its capabilities and performance which were false.

41. Claudio Rossi and Federico Rossi individually, and for their own personal, pecuniary and financial gain supplied information to Plaintiffs to guide them in their decision to enter into a business decision to fund the construction and purchase of the ocean-going high-speed luxury yacht capable of unrestricted navigation.

42. The discussions with Claudio and Federico Rossi occurred prior to May 2016, but continued and culminated while the Defendants were present in the State of Florida.

43. This information included but was not limited to the following representations made by the Family members while at the Plaintiffs' residence in Miami on May 19th and 20th 2016:

    a.  The Yacht was designed and constructed using proven technology.

    b.  The Yacht as designed and constructed had superior luxury stabilization underway.

c.  The Yacht was stable for transatlantic crossing and was capable for use in the Bahamas, Caribbean and Mediterranean.

d.  The Yacht as designed and constructed was capable of the RINA Class definition of "Unrestricted Navigation"

e.  The Yacht was tested prior by tank testing and a University study proving it was safe and stable.

f.   The design of the Yacht was overseen and arranged by the best naval architect in the industry who has successfully designed hundreds of similar boats.

g.  The Yacht was originally commissioned by an experienced owner that wanted speed, ability to go back and forth from Florida to Caribbean and Bahamas as well as transatlantic to the Mediterranean.

h.  The Yacht's engineering, which integrated the shallow shoal draft hull with the "revolutionary" and "space age" gyrostabilizers that apply force and torque across the extended beam would stabilize the Yacht.

i.  The Yacht had "Zero gravity stabilization at anchor or docked and superior stabilization and comfort under way at faster speeds than most yachts and very quiet."

j.  There are known or established naval architectural and engineering formulae for the stabilization of ships and yachts based on displacement, size design, weight and speed that determine stabilization, and that those engineering and naval architectural formulae were all applied to the design, specifications, and construction of the Yacht to determine that it was built stable and safe for operational use.

  k. The Yacht was built using the most advanced and best gyrostabilizer company in the industry.

  l. The Yacht's design had been previously "tank tested and then sea trialed' successfully on other yachts.

  m. The Yacht was revolutionary and tested and based on sound engineering.

44. The information supplied by Defendants to guide and assist the Plaintiffs in the decision as to the investment of funds for the construction and purchase of an ocean-going high-speed luxury yacht capable of unrestricted navigation was false.

45. The Defendants knew at the time the information supplied was false and made these false statements with the intent of inducing Plaintiffs to invest money in the completion of the Yacht.

46. Plaintiffs justifiably relied upon the representations of Claudio and Federico Rossi in reaching a determination as to the funding of the completion of the construction and purchase of the Yacht.

47. As a result of the representations of the Defendants, Plaintiffs invested funds in excess of $40,000,000 to fund the completion of the construction of the Yacht.

48. On May 20, 2016, while meeting with Defendants in Miami, Plaintiffs committed to funding the money necessary to complete the construction of the Yacht and to purchase the completed Yacht from the Family Shipyard.

49. The Yacht was not designed and engineered as represented.

50. The Yacht when delivered did not perform as represented by the Defendants.

51. The Yacht was not capable of performing as represented by the Defendants.

52. The Yacht was built as an "experiment" not with proven technology as represented by Defendants.

53. Following the construction of the yacht and its delivery by the Family Shipyard, the Plaintiffs learned that material representations made by the Defendants as to the Yacht's engineering and capabilities were false.

54. Specifically the Plaintiffs discovered that:

   a.  The Yacht's gyro stabilizer is insufficient to stabilize the Yacht.

   b.  High and/or frequent wave conditions are beyond the capacity of the stabilizer system making the stabilizer prone to failure.

   c.  Due to the Yacht's shallow draft, water jet design, the Yacht is fully reliant upon a functioning stabilization system for the welfare of its personnel and mitigation of its own destruction from large accelerations

   d.  The Yacht is unstable and not capable of safe navigation in a seaway as evidenced on multiple occasions during which the gyrostabilizer shut down suddenly and without warning, causing the Yacht to toss uncontrollably, inciting crew panic, damaging major equipment onboard and ripping furniture and fixtures off their floor mountings, and shattering glass on various surfaces.

   e.  The Yacht's gyrostabilizer is not capable of stabilizing the Yacht and in fact has the potential to work against stabilization causing the Yacht to roll excessively, threatening the safety of passengers and crew.

   f.  The gyrostabilizer under certain failure modes increases the roll amplitude causing physical damage to the Yacht and endangered the safety of the crew.

g.  There is no known method to increase the capacity of the gyro stabilizer in order to make the Yacht safe for navigation.

h.  The Yacht cannot safely navigate without proper stabilization given its shoal draft water jet design and therefore is not capable of unrestricted navigation or even short voyages involving high and/or frequent wave conditions.

i.  The Yacht cannot be safely operated away from its dock in a seaway.

j.  The failure of the directional tracking on the Yacht contributes to mast blockage of antennas required for GPS navigation, internet, and cellular communication systems critical to the operational safety of the Yacht, causing frequent and long periods of service interruption.

k.  The Yacht cannot fulfill its primary purpose of safe, comfortable navigation with transatlantic capability.

l.  The Yacht is not safe to navigate on Biscayne Bay in any sea state than perfectly calm.

55. The falsity of the pre investment representations and gross misstatements by the Defendants as to the construction, design and capabilities of the vessel became apparent during the use of the vessel.

56. The deficiencies causing the foregoing events were known to the Defendants at the time they induced the Plaintiffs to invest in the construction of the vessel.

57. The Defendants knowingly and deliberately and with reckless and wanton disregard for the truth misrepresented the capabilities and properties of the vessel.

58. Plaintiffs were unable to discover the falsity of the representations by the Defendants and the true facts until delivery of the yacht in May 2018. The Plaintiffs have suffered

financial damages including but not limited to loss of their investment, expense to cure the deficient conditions in an attempt to salvage/protect/recoup their investment, loss of use, and additional consequential and incidental expense.

## COUNT I - FRAUD

59. Plaintiffs repeat the allegations contained in paragraphs herein 1-58 with full force and effect thereof.

60. The representations by Claudio Rossi, Claudia Rossi and Federico Rossi as set forth in paragraphs 26, 28, 29, 30, 31, 32, 34, 35 and 43 were material to the decision of Plaintiffs to invest funds in the construction of the Yacht.

61. Claudio Rossi, Claudia Rossi and Federico Rossi made the representations with knowledge as to the falsity of the representations.

62. Claudio Rossi, Claudia Rossi and Federico Rossi knew the design and proposed stabilization technique were experimental and not proven technology with regard to the designed shallow-draft hull form and water-jet propulsion of the yacht.

63. Despite Claudio Rossi, Claudia Rossi and Federico Rossi representing that the design of the Yacht was overseen and arranged by the best naval architect in the industry and who has successfully designed hundreds of similar boats, the naval architect denies being consulted regarding design or approval of the specifications for stabilization of the Yacht.

64. Claudio Rossi, Claudia Rossi and Federico Rossi intended that the misrepresentations induce Plaintiffs to act upon it and invest funds in the construction of the Yacht.

65. The Plaintiffs, premised upon the representations made prior to and while Defendants were in Miami, were induced into investing significant funds to the Family Shipyard for the construction of what was actually an experimental Yacht.

66. The commitment to invest funds was made by Plaintiffs on May 20, 2016 in Miami, Florida.

67. The experimental Yacht as-built did not comport with the representations in the following manner:

   a.   The Yacht's gyro stabilizer is insufficient to stabilize the Yacht.

   b.   High and/or frequent wave conditions are beyond the capacity of the stabilizer system making the stabilizer prone to failure.

   c.   Due to the Yacht's shallow draft, water jet design, the Yacht is fully reliant upon a functioning stabilization system for the welfare of its personnel and mitigation of its own destruction from large accelerations

   d.   The Yacht is unstable and not capable of safe navigation in a seaway as evidenced on multiple occasions during which the gyrostabilizer shut down suddenly and without warning, causing the Yacht to toss uncontrollably, inciting crew panic, damaging major equipment onboard and ripping furniture and fixtures off their floor mountings, and shattering glass on various surfaces.

   e.   The Yacht's gyrostabilizer is not capable of stabilizing the Yacht and in fact has the potential to work against stabilization causing the Yacht to roll excessively, threatening the safety of passengers and crew.

   f.   The gyrostabilizer under certain failure modes increases the roll amplitude causing physical damage to the Yacht and endangered the safety of the crew.

   g.   There is no known method to increase the capacity of the gyro stabilizer in order to make the Yacht safe for navigation.

    h.   The Yacht cannot safely navigate without proper stabilization given its shoal draft water jet design and therefore is not capable of unrestricted navigation or even short voyages involving high and/or frequent wave conditions.

    i.   The Yacht cannot be safely operated away from its dock in a seaway.

    j.   The failure of the directional tracking on the Yacht contributes to mast blockage of antennas required for GPS navigation, internet, and cellular communication systems critical to the operational safety of the Yacht, causing frequent and long periods of service interruption.

    k.   The Yacht cannot fulfill its primary purpose of safe, comfortable navigation with transatlantic capability.

    l.   The Yacht is not safe to navigate on Biscayne Bay in any sea state than perfectly calm.

68. At the time of the representations of the design, engineering and build the Defendants knew the representations were false and had no basis for the assertion that the Yacht as built comported to the representations.

69. Plaintiffs were injured in as a result of their acting in reliance on the misrepresentations having sustained damages which include but are not limited damages sufficient to compensate Plaintiffs for the loss of benefit of their financial investment with the Family shipyard, expense to cure the deficient conditions in an attempt to salvage/protect/recoup their investment, loss of use, additional consequential and incidental expense.

Wherefore, Plaintiffs demands judgment against Claudio Rossi and Federico Rossi for actual, consequential, incidental, exemplary and punitive damages together with interest and taxable costs.

**COUNT II - NEGLIGENT MISREPESENTATION (Pled in the Alternative to Count 1)**

70. Plaintiff's repeat the allegations contained in paragraphs herein 1-58 with full force and effect thereof.

71. The representations by Claudio Rossi, Claudia Rossi and Federico Rossi as set forth in paragraphs 26, 28, 29, 30, 31, 32, 34, 35 and 43 were material to the decision of Plaintiffs to invest funds in the construction of the Yacht.

72. Claudio Rossi, Claudia Rossi and Federico Rossi made the representations without knowledge as to the truth or falsity thereof, or in the alternative, under circumstances in which they ought to have known of the falsity of the representations inasmuch as the yacht was experimental and not proven technology.

73. Plaintiffs justifiably relied upon the representations of the Defendants in making their decision to invest funds in the construction of the Yacht.

74. The experimental Yacht as built did not comport with the representations in the following manner:

    a.  The Yacht's gyro stabilizer is insufficient to stabilize the Yacht.

    b.  High and/or frequent wave conditions are beyond the capacity of the stabilizer system making the stabilizer prone to failure.

    c.  Due to the Yacht's shallow draft, water jet design, the Yacht is fully reliant upon a functioning stabilization system for the welfare of its personnel and mitigation of its own destruction from large accelerations

    d.  The Yacht is unstable and not capable of safe navigation in a seaway as evidenced on multiple occasions during which the gyrostabilizer shut down suddenly and without warning, causing the Yacht to toss uncontrollably, inciting crew panic,

damaging major equipment onboard and ripping furniture and fixtures off their floor mountings, and shattering glass on various surfaces.

e.  The Yacht's gyrostabilizer is not capable of stabilizing the Yacht and in fact has the potential to work against stabilization causing the Yacht to roll excessively, threatening the safety of passengers and crew.

f.  The gyrostabilizer under certain failure modes increases the roll amplitude causing physical damage to the Yacht and endangered the safety of the crew.

g.  There is no known method to increase the capacity of the gyro stabilizer in order to make the Yacht safe for navigation.

h.  The Yacht cannot safely navigate without proper stabilization given its shoal draft water jet design and therefore is not capable of unrestricted navigation or even short voyages involving high and/or frequent wave conditions.

i.  The Yacht cannot be safely operated away from its dock in a seaway.

j.  The failure of the directional tracking on the Yacht contributes to mast blockage of antennas required for GPS navigation, internet, and cellular communication systems critical to the operational safety of the Yacht, causing frequent and long periods of service interruption.

k.  The Yacht cannot fulfill its primary purpose of safe, comfortable navigation with transatlantic capability.

l.  The Yacht is not safe to navigate on Biscayne Bay in any sea state than perfectly calm.

75. Plaintiffs were injured in as a result of their acting in justifiable reliance on the misrepresentations having sustained damages which include but are not limited to loss of

their investment, expense to cure the deficient conditions in an attempt to salvage/protect/ recoup their investment, loss of use, additional consequential and incidental expense.

Wherefore, Plaintiffs demands judgment against Claudio Rossi and Federico Rossi for actual, consequential and incidental damages together with interest and taxable costs.

### COUNT III INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF PLAINTIFFS pursuant to Restatement 2nd of Torts § 552

76. Plaintiffs repeat the allegations contained in paragraphs herein 1-58 with full force and effect thereof.

77. The Family Defendants in the course of their business in which they have a pecuniary interest, supplied false information for the guidance of Plaintiffs in their business transaction and failed to exercise reasonable care or competence in obtaining or communicating information justifiably upon by Plaintiffs in making a decision to invest in the Yacht to be constructed at the Family Shipyard.

78. The Family members individually and in concert with each other represented and provided the following false information for the guidance of the Plaintiffs for their own pecuniary gain:

   a. The Yacht was designed and constructed using proven technology.

   b. The Yacht as designed and constructed had superior luxury stabilization underway.

   c. The Yacht was stable for transatlantic crossing and was capable for use in the Bahamas, Caribbean and Mediterranean.

   d. The Yacht as designed and constructed was capable of the RINA Class definition of "Unrestricted Navigation"

e.  The Yacht was tested prior by tank test and a University study proving it was safe and stable.

f.   The design of the Yacht was overseen and arranged by the best Naval Architect in the industry and who has successfully designed hundreds of similar boats.

g.  The boat was originally commissioned by an experienced owner that wanted speed, ability to go back and forth from Florida to Caribbean and Bahamas as well as transatlantic to Mediterranean.

h.  The Yacht's engineering, which integrated the shallow shoal draft hull with the" revolutionary" and "space age" gyrostabilizers that apply force and torque across the extended beam, would stabilize the boat.

i.  The Family represented the Yacht had "Zero gravity stabilization at anchor or docked and superior stabilization and comfort under way at faster speeds than most yachts and very quiet."

j.  The Family represented there are known or established naval architectural and engineering formulae for the stabilization of ships and yachts based on its displacement, size design, weight and speed that determine stabilization and those engineering and naval architectural formulae have all been applied with the design and construction of the Yacht to render it stable and safe for operational use.

k.  The Yacht was built using the most advanced and best gyrostabilizer company in the industry.

l.  The Family represented the design had been previously "tank tested and then sea trialed" successfully on other yachts.

    m. The Yacht was revolutionary and tested and based on sound engineering.

79. The Defendants made the statements to Plaintiffs to provide guidance to Plaintiffs in their decision to invest in the Yacht.

80. Plaintiffs were the intended recipients of the guidance provided by the Defendant Family.

81. The false information was material to the decision of the Plaintiffs to invest funds to complete the construction of the Yacht.

82. The Plaintiffs justifiably relied upon the information supplied by the Defendant Family members to influence Plaintiffs to invest in the Yacht to be constructed by the Family Shipyard.

83. Plaintiffs were injured in as a result of their acting in reliance on the false information conveyed by the Family members.

84. Instead of a high speed Yacht capable of unrestricted navigation in a safe and comfortable manner, the Yacht is unstable and unsafe to navigate in a seaway as evidenced by physical damage sustained when the gyrostabilizer failed while in a seaway.

85. The essential purpose of investing in the completion of construction of a high performance ocean going Yacht which was capable of safe and comfortable navigation was unfulfilled.

86. Plaintiffs sustained damages which include but are not limited damages sufficient to compensate Plaintiffs for the loss of benefit of their financial investment with the Family shipyard, expense to cure the deficient conditions in an attempt to salvage/protect/recoup their investment, loss of use, additional consequential and incidental expense.

Wherefore, Plaintiffs demands judgment against Claudio Rossi, Claudia Rossi and Federico Rossi for actual, consequential and incidental damages together with interest and taxable costs.

## COUNT IV - CONSPIRACY TO DEFRAUD

87. Plaintiffs repeat the allegations contained in paragraphs herein 1-58 with full force and effect thereof.

88. In order to induce the Plaintiffs to proceed with a funding of the construction or purchase of a yacht manufactured by the Family Shipyard; Federico Rossi, Claudia Rossi and Claudio Rossi conspired to defraud the Plaintiffs by providing false information to the Plaintiffs which they knew the Plaintiffs would rely upon in making a decision to invest in the construction of the Yacht.

89. The Family Defendants entered into a scheme to provide false and misleading information to the Plaintiffs regarding the design, engineering and construction of the Yacht and to preclude the Plaintiffs from obtaining truthful information upon which to make their investment decisions.

90. The Family Defendants entered into discussions with the Plaintiffs and their representatives during which time the Family Defendants made statements as to the Yacht, its engineering, its capabilities and performance as more fully described in paragraphs 26, 28, 29, 30, 31, 32, 34, 35, 38, and 43 which were false.

91. In furtherance of the scheme Defendants sent emails and placed telephone calls to Plaintiffs in Miami, Florida in which they supplied the Plaintiffs with false and misleading information with the intent to defraud the Plaintiffs and cause Plaintiffs to invest in a financially non-viable investment.

92. In furtherance of their conspiracy to defraud the Plaintiffs; Federico Rossi and Claudio Rossi traveled to Florida to meet with the Plaintiffs as well as their employees and agents to supply false information as to the engineering, capabilities and stability of the vessel as more particularly set forth below in an effort to induce Plaintiffs to invest in the construction of the Yacht.

93. The discussions with Federico Rossi and Claudio Rossi occurred on May 19th and 20th, 2016 while the Defendants were present at the Plaintiffs' residence in Miami.

94. This information included but was not limited to the following representations :

    a.  The Yacht was designed and constructed using proven technology.

    b.  The Yacht as designed and constructed had superior luxury stabilization underway.

    c.  The Yacht was stable for transatlantic crossing and was capable for use in the Bahamas, Caribbean and Mediterranean.

    d.  The Yacht  as designed and constructed was capable of the RINA Class definition of "Unrestricted Navigation"

    e.  The Yacht was tested prior by tank test and a University study proving it was safe and stable.

    f.   The design of the Yacht was overseen and arranged by the best Naval Architect in the industry and who has successfully designed hundreds of similar boats.

    g.  The boat was originally commissioned by an experienced owner that wanted speed, ability to go back and forth from Florida to Caribbean and Bahamas as well as transatlantic to Mediterranean.

h.  The Yacht's engineering, which integrated the shallow shoal draft hull with the "revolutionary" and "space age" gyrostabilizers that apply force and torque across the extended beam, would stabilize the Yacht.

i.  The Family represented the Yacht had "Zero gravity stabilization at anchor or docked and superior stabilization and comfort under way at faster speeds than most yachts and very quiet."

j.  The Family represented there are known or established naval architectural and engineering formulae for the stabilization of ships and yachts based on its displacement, size design, weight and speed that determine stabilization and those engineering and naval architectural formulae have all been applied with the design and construction of the Yacht to render it stable and safe for operational use.

k.  The Yacht was built using the most advanced and best Gyro Stabilizer company in the industry.

l.  The Family represented the design had been previously "tank tested and then sea trialed" successfully on other yachts.

m.  The Yacht was revolutionary and tested and based on sound engineering.

95. The information supplied by Defendants was provided in furtherance of the conspiracy to defraud the Plaintiffs.

96. As a result of the materials provided by Defendants and representations of the Defendants, Plaintiffs invested a sum in excess of $40,000,000 to fund the construction of the Yacht.

97. The Yacht as constructed did not perform as represented by the Defendants.

98. Following the construction of the Yacht and its delivery by the Family Shipyard, the Plaintiffs learned that material representations made by Federico Rossi and ratified by Claudio Rossi made in Miami as to the vessel's engineering and capabilities were false.

99. Specifically the Plaintiffs discovered that the experimental Yacht as built did not comport with the representations in the following manner:

   a. The Yacht's gyro stabilizer is insufficient to stabilize the Yacht.

   b. High and/or frequent wave conditions are beyond the capacity of the stabilizer system making the stabilizer prone to failure.

   c. Due to the Yacht's shallow draft, water jet design, the Yacht is fully reliant upon a functioning stabilization system for the welfare of its personnel and mitigation of its own destruction from large accelerations

   d. The Yacht is unstable and not capable of safe navigation in a seaway as evidenced on multiple occasions during which the gyrostabilizer shut down suddenly and without warning, causing the Yacht to toss uncontrollably, inciting crew panic, damaging major equipment onboard and ripping furniture and fixtures off their floor mountings, and shattering glass on various surfaces.

   e. The Yacht's gyrostabilizer is not capable of stabilizing the Yacht and in fact has the potential to work against stabilization causing the Yacht to roll excessively, threatening the safety of passengers and crew.

   f. The gyrostabilizer under certain failure modes increases the roll amplitude causing physical damage to the Yacht and endangered the safety of the crew.

   g. There is no known method to increase the capacity of the gyro stabilizer in order to make the Yacht safe for navigation.

h.  The Yacht cannot safely navigate without proper stabilization given its shoal draft water jet design and therefore is not capable of unrestricted navigation or even short voyages involving high and/or frequent wave conditions.

i.  The Yacht cannot be safely operated away from its dock in a seaway.

j.  The failure of the directional tracking on the Yacht contributes to mast blockage of antennas required for GPS navigation, internet, and cellular communication systems critical to the operational safety of the Yacht, causing frequent and long periods of service interruption.

k.  The Yacht cannot fulfill its primary purpose of safe, comfortable navigation with transatlantic capability.

l.  The Yacht is not safe to navigate on Biscayne Bay in any sea state than perfectly calm.

100.  The Family knew that a yacht could not function was worth nothing.

101.  The Yacht as constructed did not function.

102.  Plaintiffs were injured in as a result of their acting in reliance on the misrepresentations having sustained damages which include but are not limited damages sufficient to compensate Plaintiffs for the loss of benefit of their financial investment with the Family shipyard, expense to cure the deficient conditions in an attempt to salvage/protect/recoup their investment, loss of use, additional consequential and incidental expense.

Wherefore, Plaintiffs demands judgment against Claudio Rossi, Claudia Rossi and Federico Rossi for actual, consequential and incidental damages together with interest and taxable costs and such other and further relief as may be just and proper.

Dated: July 2, 2019

Respectfully submitted,

*By:/s Christopher R. Fertig*
CHRISTOPHER R. FERTIG, ESQ.
Florida Bar No.: 218421
chris.fertig@fertig.com
DARLENE M. LIDONDICI, ESQ.
Florida Bar No.: 516521
dml@fertig.com
FERTIG & GRAMLING
200 S.E. 13th Street
Fort Lauderdale, FL 33316
Telephone: 954-763-5020
Facsimile: 954-763-5412
*Counsel for Defendant*